Move to the second case this morning, Hoglund v. Neal. Mr. Bence. May it please the court. My name is Andrew Bence, court-appointed pro bono counsel for Mr. Hoglund. Mr. Hoglund is entitled to a writ of habeas corpus for two reasons. First, his counsel rendered ineffective assistance at his trial. He failed to properly object to what was clearly hearsay testimony, allowing three experts to tell the jury the accusations that the accuser made all over again. And second, Mr. Hoglund was robbed of his right to due process when each of those experts also vouched for the credibility of the accuser. Now I'd like to first focus on the ineffective assistance of counsel claim. Both the state court and the district court agreed that counsel's performance was deficient in this case, and the only question is whether that deficient performance prejudiced Mr. Hoglund. And on that score, the state court applied the wrong standard. It did not apply the Strickland prejudice standard. Instead, the state court asked whether Mr. Hoglund was entitled to reversal of his conviction. In other words, whether the trial court erred in admitting the hearsay testimony. But that is not what Strickland asks. Even my friend on the other side agrees that the state court invoked language in addition to the Strickland standard. Strickland asks whether there is a reasonable probability, but for counsel's unprofessional errors, that the trial would have come out differently. And under that standard, Mr. Hoglund has shown prejudice. Consider what the state jury should have heard. It should have heard the accusations from the accuser, as well as the denials by the defendant, and the fact that the accusations of molestation only came out after Mr. Hoglund's wife learned of his affair. Now that is a close case, and one in which a jury could or might not convict. But the state had more arrows in its quiver. It had three experts each testify that the accuser had told them the same story. And as the district court concluded, that made the accuser's credibility much stronger. And there is a strong argument that could be made that he was prejudiced by that. Thus, I think the district court has told this court that under a de novo standard, there was prejudice here. Now, if there are no questions on the ineffective assistance counsel claim, I'll turn to the due process claim. Under the due process claim, Mr. Hoglund was denied due process because each of those experts was allowed to vouch for the accuser's testimony or the accuser's credibility. That sort of testimony is banned by virtually every state, including Indiana. Can you talk about the default? So Mr. Hoglund did not procedurally default his claim. He fairly presented it to the state court. All that fair presentment requires is that, fair presentment, that the state court was aware of the claim. And there are a number of indications that the state court was aware of that claim. First and foremost, the state court concluded that he was not denied fundamental due process. Second, Mr. Hoglund's brief framed the issue as vouching, which calls to mind constitutional litigation over prosecutorial vouching for witnesses. In addition, the facts of the case bring to mind constitutional claims, which involve this sort of vouching problem. And finally, even in his pro se petition for rehearing, Mr. Hoglund recognized that there was a due process problem. All of those indications show that he did not procedurally default because he presented his claim to the Indiana Supreme Court. The only thing that my friend on the other side points to is the fact that he did not cite a federal case in his petition to the Supreme Court. But the context was Indiana's vouching rule. The context was his objection to Indiana law, which makes it harder to say that all of these things call to mind a federal due process argument. So in response, I would say that he also cited cases from outside of Indiana. He cited a number of other opinions, which would not directly affect Indiana's state law. But on the evidentiary issue, right? Right. But those cases all say that this is a fundamental problem when you have this sort of vouching for the credibility of a child witness. And a number of the cases say it's a manifest injustice when this sort of evidence is introduced. Under the due process clause? They're saying it under their own state evidentiary laws. But I think it speaks to a broader due process problem that the Indiana Supreme Court would have recognized. That's multiple inferences, though, right? I mean, because the difficult thing, you know, he had gotten this Pyrrhic victory, right? You know, the Indiana Supreme Court had reversed its rule, but then he didn't get the benefit of that. And given that the whole thing was about Indiana's evidentiary rule that permitted this vouching testimony, it does seem, right, like the Indiana Supreme Court would not have been on notice that what he really wanted I mean, I think that the Indiana Supreme Court, looking at his motion, would have thought that he was objecting to his not getting relief after the evidentiary rule was changed. But I think the reason that the victory was Pyrrhic was because the Indiana Supreme Court concluded he was not denied fundamental due process. That's exactly what the Indiana Supreme Court said. So I think the Indiana Supreme Court was signaling that it did understand the due process implications of Mr. Hoagland's claim, that it was not merely a state evidentiary issue. It invoked due process concerns, and that is why virtually every state has rejected this sort of testimony, this vouching testimony. And I'll turn to the substance of the vouching claim. Each of these experts was called upon to tell the jury essentially that they believed the witness was telling the truth. Over and over again, the jury heard that the child accuser was telling the truth. And this was not just caregivers or parents saying that the accuser was telling the truth. These were three experts trained to evaluate and treat victims of abuse. And so the jury was surely overwhelmed by this and very likely substituted the credibility of the expert witnesses for the credibility of the accuser. What was the sequence of the testimony? When did the victim testify as opposed to these vouchers? The victim, I believe, testified before each of the experts testified. And then Dr. Butler testified first, then Counselor Shestack, and then Dr. Mayo. So the victim testified first? That's correct, yes. It's some detail too, yes? That's right. The victim did give details. How old was she when she testified? She was 12 when she was testifying about things that happened five years prior, or four years prior and five years prior. I haven't seen a transcript of that. I don't know if one exists. But there was some mention, at least in the briefs, that she was pretty well challenged. Is that correct? She was cross-examined. That's correct. So she's 12 years old. She claims to be this whole started when she was about four, and mostly when it was five through seven, I guess. Is that right? With lots of encounters, I'll call them. That's where she testified to. Right. And then I don't know how long each of the, we'll call them vouchers, testified, but I assume theirs was relatively short. I mean, they just basically, yeah, it's a problem. They come up and said, yeah, they believed her. Well, I would point to the district court, and it described this trial as replete with vouching. So it wasn't just one expert saying, oh, I think she's telling the truth. This was repeated instances where each expert testified multiple times that the accuser was telling the truth. Multiple times, so why aren't you questioning? Yeah, so the prosecutor, for example, asked, do you think the witness is prone to fantasize? Do you think the witness is prone to exaggerate? Does she have a need to tell this story? Do children generally tell the truth about these kinds of matters? Should children be believed when they make these sort of accusations? These were the repeated questions that the prosecutor asked these three witnesses. And then, in closing, the prosecutor pointed back to all of these instances of vouching, saying, look at what these experts have told you, jury. They've told you the accuser is telling the truth. So a jury's going to have to discern, I guess the jury look at it, because he testified as well, right? He did. And I assume denied everything. That's right. And was there intense cross-examination on that, or did they just let it go at that? He was cross-examined as well, but I think that points out that this really came down to the accuser's accusations and his denials. There was no physical evidence, no eyewitness corroboration. Well, there was his comment, which were a little strange, to the officer that examined him. To the detective. How about his being passed out? The one about him being passed out. Yeah, passed out in several other aspects. So the district court certainly fixated on that statement to Detective Holliday. But I think we have to take a step back and look at when and where the statement was made. When he was first confronted by the detective with these accusations, he said, no way, it never happened. Then after four hours of more questioning by the detective, he finally said, there's no way it happened, not unless I was passed out, and she took it upon herself. I think in context, what he was saying is, there's no way this happened. And he's giving an example of how this could not have happened, that basically no child would take this upon themselves, and so it didn't happen. And that's what I think the statement was trying to convey, and artfully, but trying to convey. What's the connection then when the sequence, but at some point she, the mother, finds out that, what's her name, Hoagland, was cheating on her. And so that, I guess, ended the marriage or beginning of the end of the marriage or whatever. So I think that's a critical fact. Tell me why you think that. Because the accusations of molestation only came out after Mr. Hoagland's wife learned of his affair. Do you think she knew about this problem going on all along and only then decided to say something? That's not reflected in the record. The defense's theory was that the wife made this up in retaliation for the affair. And I think a jury hearing this evidence could certainly reach that conclusion as well. But here, the jury was not presented with fair evidence. It was presented with the state calling these three expert witnesses not only to vouch, but also to introduce this hearsay testimony, which allowed the jury to hear that the accuser had made these allegations over the course of a number of years. When you say the mother was retaliating, is she, at that point, denying or admitting, I guess, that she knew this was happening? She says that the accuser only came to her after the accuser learned of the affair. She was eight years old, right? That was when she was eight years old. That's correct. And I see I'm almost to my rebuttal time, so I will reserve the balance of my time. May it please the court. This court should affirm the district court because the state court properly applied Strickland in determining that trial counsel was not ineffective in his representation of Hoagland in regard to the hearsay statements. I would first point out that counsel talks about three different experts and that being the issue. Actually, there were only two experts that were at issue. The first expert, her, Dr. Butler's testimony was not objected to and that issue was not preserved throughout the appellate process. So her testimony of recounting the child's allegations have never been challenged. What was the thrust of her? It was the same as the other experts, as the health professionals, that all testified as to why they were seeing the victim. That the victim, so Dr. Butler said, the victim came in under a report that she had been molested by her father by fellatio and so I treated her based on those allegations. And then the counselor testified she had, the allegation was that her father had sexually molested her by fellatio and so I, different words, the testimony was not exact, but in each of the situations it was to say why those mental health professionals or medical health professionals were meeting with A.H. So the only two doctors that were, or two health professionals that were challenged were Counselor Shestek and Dr. Mayo. So the jury already heard from Dr. Butler that her story was consistent. They also heard from the detective who testified that her testimony on the stand was consistent with the interview that he had done with the child victim. Am I right though that the two, who you're referring to, the two experts who simply said the circumstances under which they had examined her didn't repeat in detail all of the descriptions, you know, the kind of horrific descriptions that she gave about what her father did? They used some detail, different detail. It's not that they didn't use any detail, but no A.H. had testified to and the jury already heard from A.H. She was very detailed, very thorough, gave very compelling testimony to the jury and so this additional evidence, the court of appeals, the Indiana Court of Appeals was not unreasonable in determining that there was no prejudice by these two extra accounts. But Counselor, I mean, I guess I don't understand why a review wouldn't be de novo here because the state court did not cite, I mean, yes, said, you know, the deficient, found that Counsel's performance was deficient, but it did not articulate the right Strickland test on the second prong. It didn't talk about reasonable probability at that part of its opinion. It talked about whether it affected substantial rights. That's a different standard. It's contrary to federal law, right? No, I don't believe so. First of all, they did cite the correct standard for Strickland At the beginning of the opinion. At the beginning of the opinion before they started to go through the instances of alleged deficient performance. When they reached the question of the hearsay, they first said, at most, this is harmless error. And then they said, therefore, this cannot be, he has not shown ineffectiveness as a counsel. So it seems to me that the court of appeals was actually saying he didn't even meet the lower standard of harmless error. And because he couldn't even meet the lower standard of harmless error, he can't meet the higher standard of Strickland. So that's, they say, at most, this was harmless error. Therefore, we cannot conclude that trial counsel provided ineffective assistance. That they were applying, they were looking at the effect of this evidence on the verdict, what effect this had, and they said the effect of this evidence was harmless. So therefore, he was not prejudiced by its admission. Harmless because of her testimony? Harmless because of her testimony, and it was cumulative of other testimony, like Dr. Butler's testimony and Detective Holliday's. Now, they don't explicitly say that, but they say it was cumulative of other testimony. And it was cumulative of Dr. Butler's testimony and Detective Holliday's. How long was she on the stand? I don't have a time. It's multiple pages of, she was on the stand for a long time, and it was extensive cross-examination by the defense attorney. Is there a transcript of that somewhere? Yes, there is, and that's been submitted to the court as part of the state court record. This court has that available to it. On the procedural default for the due process claim, the Supreme Court said in Duncan that if you want to raise, if a petitioner wants to raise a due process claim in state court and to preserve it for federal habeas review, it has to at least state it's raising a due process, the petitioner's raising a due process claim. Here, there is no suggestion anywhere in the state court record that he is raising a claim that admission of this evidence by itself is a due process violation. And I think the fact that he can't show that, first of all, he doesn't have a clearly established federal case that he can point to, is that if the Indiana Supreme Court had gone the other way and found that under Indiana evidence rules, this evidence was admissible, he wouldn't have a due process claim to say that Indiana having that rule violates due process. There is no, there would be no case to support that, so it doesn't, it's hard to see the argument that he was raising a due process claim to the Supreme Court. Even on his petition for rehearing, it's the first time he uses the phrase due process. He actually is not complaining about the admission of evidence, he's complaining that he didn't have additional time to brief the question of if the rule applied, if the evidence was not admissible, how it prejudiced him, which of course he had the opportunity to present that. And I would note that the, I think it was just a misunderstanding by Mr. Hoglund, who was pro se on his petition for rehearing as to the appellate process and what needs to be raised when, but again, new issues can't be raised in Indiana on a petition for rehearing as in most appellate courts. Counsel, I think you responded to judgment. Mr. Hoglund testified? Correct. And he testified extensively as well. And he was examined based on what he told the police officer? Correct. The fact that the Indiana Supreme Court looked at whether this was fundamental error was not a review for whether there was a federal due process violation. Fundamental error in Indiana is a exception to the waiver rule of not preserving a claim for appellate review and whether the appellate court should ignore the waiver and still address the claim. And even this court has said Indiana's fundamental error analysis is not a reviewable claim on the merit, a review of the merits to preserve for federal habeas review. Well, I assume that in the trial, the other side objected to the so-called vouchers. Was there a strong contesting of that before the court about there should not be able to testify? No. The way it went was that defense counsel objected to the statement about was she prone to fantasize or exaggerate sexual matters. And the state cited the cases from the court appeals, Indiana court appeals, that allowed that type of testimony. And the objection was overruled. The trial counsel did object to direct vouching of Dr. Butler when unprompted she said, I believe this victim and he objected as direct vouching. And the court sustained that objection and admonished the jury not to listen to it. So counsel was in this area where vouching is not direct vouching, indirect vouching, and when indirect vouching actually is objectionable was objecting based on the nature of the questions, but recognizing what the state of Indiana law was at the time of the trial. And I would just point out that the closing argument of the state briefly mentioned that Dr. Mail and Dr. Shestek said that she was not prone to exaggerate in sexual matters. That was the only comment on vouching in the closing by the state. The state did not focus on this vouching evidence in asking the jury to convict. It completely focused on the consistency and believability of the victim's statements on the stand. Well, as you know, that's their main thrust of their argument before us in the vouching. Correct. And of course, this court can't reach the vouching claim because it was not fairly presented to the state court. Oh, just one other point on the record. A.H.'s mother explained that A.H. had come forward to her earlier when she was younger and that she did not believe A.H. at the time because she didn't know what she was saying because she had talked about that her father had made her wash his genitals and she didn't understand really what she was saying. Is this the showering thing? Well, I think it's a confusion about the showering, and Counselor Shestek talked a little bit about this, is that the victim was using washing his genitals as saying oral sex. It wasn't that it was in the shower or something like that. She was talking about that's how she described oral sex. And so the mother said, I wasn't quite sure what she was saying. I thought it was something more along the lines of showering, and I confronted my husband, and he denied it, and we kind of went on. And then so the mother says, when she reported again, I realized that it had been going on and that I should have done something earlier. And so this whole suggestion of retaliation because of the infidelity is just not supported by the evidence in the way that the victim describes her parents' relationship, and in fact, her saying I didn't want them to get divorced, and the mother's testimony. And the defendant's testimony at that time doesn't rebut kind of that this was, there wasn't a real retaliation, that it was an understanding that they were going to part ways. And they were talking about staying together and filing for bankruptcy before they filed for divorce. And so the whole suggestion is somehow retaliation for the infidelity just isn't supported by the record. Well, I assume that we talk about this tearful encounter when she was eight, eight years old? Seven. She was seven at the time. She reported the second. To her mother. To her mother the second time. And the first time was about the shower. Yes. Well, the first time was, I think, about oral sex, but misunderstood as a shower. Really? Okay, well, the part I guess I'm confused about is exactly, she's 12 when she testifies. Correct. And this encounter with her mother, at least, when she's eight. I think she was seven at the time. I'm sorry, seven. Whatever it is, that's five years. Right. I assume in the interim there must have been a number of conversations. Perhaps. That evidence isn't in the record. Well, probably not. That's probably what my problem is here, that you don't just not talk about something like that. He was, yeah. Between the mother and the daughter. So after the A.H. reported to her mother the second time, they went to police shortly thereafter. And then, I think it was about a month later, the defendant was arrested for this offense. So the time between his arrest and trial was that four and a half years, or five years, was due to litigation. I guess my point is, she's 12 years old. Correct. And much more, I don't want to say much more, much different than when she was eight, when all this happened. So the reflection in detail must have been reminded of over some period of time. I don't know whether that's an argument of prosecution or defense or whatever. But that's what the jury had to believe. She had to believe her. And she provided a compelling, as the state courts found, compelling testimony in the stand. And the defendant's kind of statements about his view of things and about how she knew about sexual matters just wasn't compelling to the jury and not believable. The state asked, the respondent asked that you affirm the district court. Thank you. Thank you, counsel. So I want to make sure we have a clean separation between the two claims. So set aside the vouching claim for a moment. The ineffective assistance of counsel claim is just on the hearsay testimony. And that, this court should review afresh. There's no need to defer to the state court because the state court applied the wrong standard. And this court has said it's not merely an issue of wordsmithing. The state court has to get this substantive point correct. And because the state court here did not, it applied a reversible error standard. This court should review the prejudice analysis on its own. And on that score, I would point this court to the district court's conclusion that the accuser's testimony was made much stronger by these experts testifying. In addition, the district court said a strong argument could be made that the outcome of the trial would have been different without this hearsay testimony. That alone, I think, points to the fact that under a de novo standard, Mr. Hoagland has shown that he was prejudiced by his counsel's deficient performance. What about the state's point that really we're talking about two experts only and that their testimony wasn't emphasized by the state in its closing and that that was paled in emphasis and length by AAH's testimony? So I would again point to the district court. Okay, but we'd be reviewing the district court de novo too. So make a de novo argument. Sure, absolutely. The two experts that testified also gave the jury testimony that AAH had made these accusations over the course of a number of years in the interim that Judge Mannion was talking about earlier, between the 2007 and the 2012 period. So the jury heard from Shestack, in particular, that the accuser had made the same accusations during that interim between the time Mr. Hoagland was arrested and the trial. And that would have given the jury much more to go on in terms of the credibility of the victim. And so that testimony, Ms. Shestack and Dr. Mayles' testimony, both made the credibility of the accuser much stronger. And then finally, just to recap on the due process claim, which is separate, Mr. Hoagland did not procedurally default because he fairly presented it to the state court. This court does not require a petitioner to cite the federal constitution by book and verse. All that has to be done is a fair presentment, and that was done here. And then when this court considers whether due process was denied here, the vouching testimony is inadmissible in nearly every state, including Indiana, in this very case. But Mr. Hoagland was denied the victory here because the state court concluded he was not robbed of fundamental due process. And so this court should grant Mr. Hoagland a writ of habeas corpus. Thank you very much. Thank you. Thanks to both counsel. And counsel, you were appointed in this case, were you? Yes. You have the thanks of the court for taking the assignment and doing a very good job. Thank you. Case is taken under advisement.